# United States Court of Appeals
## For the First Circuit

No. 20-1650

CHRISTOPHER FRENCH,

Plaintiff, Appellant,

v.

DANIEL MERRILL, individually and in his official capacity as a
Sergeant in the Police Department of the Town of Orono; JOSH
EWING, individually and in his official capacity as Chief of
Police of the Town of Orono; TOWN OF ORONO; TRAVIS MORSE,
individually and in his official capacity; CHRISTOPHER GRAY,
individually and in his official capacity; NATHAN DROST,
individually and in his official capacity,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John C. Nivison, U.S. Magistrate Judge]

Before

Lynch, Lipez, and Barron,
Circuit Judges.

Timothy C. Woodcock for appellant.
Kasia Soon Park, with whom Edward R. Benjamin, Jr. and
Drummond Woodsum were on brief, for appellees.

October 1, 2021

**LIPEZ**, **Circuit Judge**.   Appellant Christopher French claims that police officers in Orono, Maine, violated his constitutional rights during two encounters in 2016 -- one in February and one in September -- both of which resulted in his warrantless arrests on charges that were later dropped.   French brought this action for damages under 42 U.S.C. § 1983 against the Town of Orono, the chief of the Orono Police Department, and four of the officers with whom he interacted during the two episodes. The district court granted summary judgment in favor of the defendants on all counts.   French appeals only the district court's entry of summary judgment on Counts I and IX alleging that the individual officers violated his Fourth Amendment rights during the February and September incidents respectively.[1]

After careful review, we affirm the district court's entry of summary judgment on Count I, relating to the February incident. We reverse on Count IX, relating to the September incident, because the unconstitutional conduct of the officers violated the clearly established law of the Supreme Court as set forth in Florida v. Jardines, 569 U.S. 1, 6 (2013).

---

[1] The remaining eleven counts alleged violations of French's Fifth Amendment, Sixth Amendment, Eighth Amendment, and procedural Due Process rights, as well as various state law tort claims, supervisory liability claims against Town of Orono Police Chief Joshua Ewing, and municipal liability claims against the Town of Orono.   None of those claims are at issue on appeal.

We describe below each of the challenged episodes between French and the law enforcement officers. We rely on the parties' limited stipulated facts[2] and recount the remaining facts as they were presented to the district court on summary judgment in the light most favorable to French as the non-moving party. See, e.g., McKenney v. Mangino, 873 F.3d 75, 78 (1st Cir. 2017).

**A. The February 2016 Incident**

In February 2016, French was a student at the University of Maine and was dating a fellow student, Samantha Nardone. In the early morning hours of February 18th, French and Nardone had an argument at Nardone's residence after a night at the local bars. A neighbor called the police and reported that the couple had been fighting loudly.

Officer Nathan Drost, Sergeant Daniel Merrill, and another officer from the Orono Police Department[3] responded to the neighbor's call at approximately 1:00 a.m. Upon arrival, the officers observed French and Drew White, one of Nardone's roommates, standing on the sidewalk in front of Nardone's

---

[2] The parties stipulated to the identity of the officers involved, the timing of the events, the addresses of the relevant locations, and the authenticity of video recording of the events from body cameras and police cruisers. They also stipulated to other minor facts which we will identify where relevant.

[3] The third officer was not named as a defendant in this case.

residence. A few moments later, Nardone and her other roommate, Alicia McDonald, came outside. Drost questioned Nardone, White, and McDonald, who all confirmed that French and Nardone had been involved in a domestic dispute.

Nardone told the officers that she and French had had similar disputes in the past, but that French had never been physically violent. She also said that she did not wish to press charges, but that she did want to end her relationship with French and wanted him to leave her alone for the night. Drost directed French to go home and cautioned him that returning to Nardone's residence within 24 hours would result in a criminal trespass warning that would ban French from the premises for a year. Drost also informed French that Nardone wanted her personal property returned the following day and offered to facilitate an exchange.

French complied with Drost's directive and left Nardone's residence. During his walk to his apartment -- which was just a short distance away -- French sent Nardone several offensive text messages.[4] Nardone showed the messages to the officers, who were still present. At that point, the officers informed Nardone that they could serve French with a notice to stop harassing her and, if he continued to harass her, French could be arrested and charged with a crime.

---

[4] The parties stipulated to the content and timing of all messages French sent to Nardone on February 18, 2016.

- 4 -

At Nardone's request, the officers caught up with French outside of his residence and served him with a Cease Harassment Notice ("CHN").  The CHN informed French that he was "forbidden from engaging, without reasonable cause, in any course of conduct with the intent to harass, torment or threaten . . . Samantha Nardone."  Less than an hour after receiving the notice, French sent Nardone two more messages via Snapchat declaring their relationship over, threatening suicide, and inviting her to his forthcoming funeral.

Later that day, French sent Nardone a message via Instagram asking if she was "ok" and assuring her that "everything is fixable."  Having received no response, French sent Nardone several emails approximately four hours later asking to "talk please" and explaining that he wanted to return some of her property.  French maintains that he was trying to comply with Officer Drost's directive to return Nardone's property that day. Two and a half hours later, French sent Nardone another email lamenting that she refused to respond to him and insisting that he only wanted to talk to her about their argument.  Forty-five minutes or so later, French sent Nardone another message inquiring about whether he could drop off Nardone's property.

At around 7:30 p.m. that evening, Officer Drost called Nardone to check in.  Nardone reported that French had been calling

- 5 -

her[5] and sending her messages via text, email, and various social media platforms throughout the day. She also told Drost that some of her friends had told her that French was looking for her on the University of Maine campus and that she had seen French during a trip to a local store with a friend and assumed French was following her. Nardone agreed to go to the Orono Police Station to complete a sworn written statement.

Nardone's statement recounted her version of the overnight dispute, described French's attempts to communicate with her throughout the day, and stated that French's conduct "terrified" her. While at the police station, Nardone received additional communications from French, which she showed to the officers. She also provided Officer Drost copies of all other messages she had received from French on February 18, 2016.[6] At 10:54 p.m., French emailed Nardone asking where she was, followed by a second email about forty-five minutes later stating "I will find u." Nardone asked the officers whether French was in trouble and they replied that he was.

---

[5] Several calls were from a "blocked" number. Nardone did not answer those calls, but she assumed they were from French. French appears to concede that he made at least some of the blocked calls.

[6] The parties stipulated that the copies Nardone provided to Officer Drost were authentic.

Based on the overnight events, their conversations with Nardone, and French's continued attempts to contact Nardone, Officer Drost and Sergeant Merrill decided to arrest French for harassment. Nardone agreed to assist in that effort. The next time French called Nardone, at 12:30 a.m. on February 19th, she was still at the police station and answered the call on speakerphone, with the officers listening. Nardone told French that he was "not supposed" to talk to her, and neither officer corrected Nardone's apparent misunderstanding of the CHN, which prohibited harassment but not all communication. French responded that he was concerned for Nardone's safety and was simply trying to discuss their fight with her.

Nardone agreed to meet French at her residence in the early morning hours of February 19th. Drost accompanied Nardone home and waited inside for French. Upon French's arrival, Drost promptly arrested him for harassing Nardone. The charges were eventually dropped by the state for insufficient evidence.

## B. The September 2016 Incident

At 3:19 a.m. on September 14, 2016, the Orono Police Department received a report of a possible break-in at Nardone's residence. Orono Police Officers Travis Morse and Christopher

- 7 -

Gray responded and, upon their arrival, obtained sworn statements from Nardone and her roommate, McDonald.[7]

Nardone reported that, at some point after the February incident, Nardone and French reconciled. She explained that she was not dating French, but that they had seen each other at a local bar earlier that evening. She told the officers that when she was driving away from the bar, French ran into the street toward her vehicle and accused her of drunk driving. French denies that allegation. Nardone recalled that, upon arriving home, she and her roommate locked the doors, Nardone placed her phone on her bedside table, and she went to sleep around 12:30 a.m. When she awoke at 3:00 a.m., her phone was missing. Nardone and McDonald looked around for the phone and discovered that their apartment door was unlocked. Nardone told Officers Morse and Gray that she suspected French had broken in and stolen her cell phone. She also explained that French had taken her keys the prior week and had not yet returned them. Sometime between 4:00 and 4:30 a.m., the officers left Nardone's residence and returned to the police station.

Shortly thereafter, at approximately 4:43 a.m., Officers Morse and Gray responded to a second call from Nardone reporting that she and her roommate had seen French attempting to enter their

---

[7] Officer Morse wore a body camera that recorded the events of the morning. Officer Gray did not wear a body camera.

- 8 -

home, but that he had run off when the women screamed. As the officers approached Nardone's building, they received another report that French had just been seen running down the street toward his apartment. They then went directly to French's apartment. At some point, two additional officers, Detective Fearon and Officer Orr from the nearby Old Town Police Department, arrived on the scene.[8]

French's residence had a small front porch with a single door. Appellees describe French's residence as "more akin to an apartment building" -- presumably compared to a single-family home -- but they fail to further explain that comparison. All we can glean from the record is that the dwelling has a single front entryway, three young adult males lived in the residence, there is a single kitchen, and French had a separate bedroom. Viewed from the street, a driveway is adjacent to the residence on the right, and, on the left, a narrow strip of grass -- four or five feet wide -- separates the property from the neighbor's adjacent driveway. On the left side of French's residence, there is a cellar window at ground level and a bedroom window that is low enough for a person of average height to reach the window frame.

_____

[8] The record does not provide an explanation for why police officers from both Orono and Old Town responded to Nardone's 911 call. It appears that Nardone's residence was located in Orono but was close to the Old Town line. In any event, Detective Fearon, Officer Orr, and the Old Town Police Department were not named as defendants in French's complaint.

Upon their arrival at French's apartment, the officers sought to speak with French about his suspected criminal activity. In pursuit of that goal, the officers entered the curtilage of French's home several times to try to convince him to come outside and talk. That is, the officers knocked on the front door and French's bedroom window frame and repeatedly yelled for French to come to the front door. We recount the details of the officers' misconduct within the curtilage of French's home in Part IV.

Eventually, French reluctantly came to the door ("When I went to the door to speak to the police, I felt I had no choice."). Officer Morse asked French whether he had been at Nardone's residence. According to Morse, French's response was jumbled and did not make sense. Morse asked French about Nardone's cell phone and French responded that he did not have it. The officers pressed French further and, eventually, he said the phone was inside and he agreed to retrieve it. The officers told French he could not reenter the residence without an officer, so French, not wanting the officers to enter his home, asked his roommate, Corey Andrews, to look for the cell phone. After a few moments, Andrews returned and reported that his search was unsuccessful. French told Andrews to check the basement stairs. Shortly thereafter, Andrews returned with Nardone's phone.

French told the officers that he had visited Nardone's residence for help with a puppy that he had recently adopted, but

that he had entered only the front entryway.  He claimed that he found the phone on the ground outside of Nardone's building.  He insisted that he had picked it up with the intention of returning it to Nardone the following day.  The officers deemed French's story not credible and arrested him for burglary at around 5:30 a.m.  The state subsequently dismissed all charges because "the victim refuse[d] to cooperate and [wa]s out of state."

## C. Procedural History

In May 2018, French filed a complaint against the Orono officers involved in the February and September 2016 incidents, seeking damages under 42 U.S.C. § 1983 for violations of his Fourth Amendment rights.[9]  Specifically, he claimed that he was arrested without probable cause in February 2016 and that, in September 2016, the officers engaged in an unlawful and warrantless search and seizure.[10]  Following discovery, the district court entered summary judgment in favor of the defendants on all counts.

---

[9] As we have explained, French also sued the Town of Orono and the police chief and brought a variety of other constitutional and state tort law claims against the officers, but none of those claims are at issue in this appeal.  See supra note 1.

[10] French labels his September 2016 Fourth Amendment claim as an unlawful seizure and explains in his reply brief that he has maintained throughout these proceedings that the officers seized him when they "effectively coerc[ed] him to come to the door against his will."  Appellees correctly note, however, that the thrust of French's argument on appeal is whether the officers violated his Fourth Amendment rights when they entered his curtilage without a warrant to conduct several investigatory "knock and talks."  That is an unlawful search claim.  Hence, we

Regarding the February 2016 incident, the district court concluded that the officers had probable cause to arrest French for harassment and, even if they did not, the question of probable cause was so debatable that the officers were entitled to qualified immunity. As for the September 2016 incident, the court concluded that "a fact finder could find that the officers' multiple attempts to persuade [French] to come to the door at an early morning hour, including attempts at a location other than the front door (i.e., a window of the home), [were] unreasonable and not within the permissible knock and talk exception to the Fourth Amendment warrant requirement." The court went on to conclude, however, that the officers' conduct was protected by qualified immunity because there was no clearly established law that rendered their conduct unlawful.

## II.

We review a district court's grant of summary judgment de novo, viewing the record in the light most favorable to the non-moving party. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to

---

limit our analysis to whether the conduct of the officers constituted an unlawful search.

a material fact exists if a fact that "carries with it the potential to affect the outcome of the suit" is disputed such that "a reasonable jury could resolve the point in the favor of the non-moving party." Santiago-Ramos, 217 F.3d at 52 (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

We begin by considering French's claim that he was improperly arrested without probable cause in February 2016 and then turn to his contentions concerning the September events.

**III.**

The Fourth Amendment protects an individual's right to be free from unreasonable seizure. U.S. Const. amend. IV. A warrantless arrest by a law enforcement officer is a reasonable seizure under the Fourth Amendment "where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). Probable cause exists where "at the moment of the arrest, the facts and circumstances within the [officers'] knowledge and of which they had reasonably reliable information were adequate to warrant a prudent person in believing that the object of his suspicions had perpetrated or was poised to perpetrate an offense." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 254 (1st Cir. 1996). In asking whether probable cause existed at the time of the arrest, we look to the "totality of the circumstances." United States v. Rivera, 825 F.3d 59, 63 (1st Cir. 2016). In doing so, we recognize

- 13 -

that "probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983).

Officer Drost and Sergeant Merrill arrested French for harassment. Under Maine law, an officer may arrest "[a]ny person who the officer has probable cause to believe has committed . . . harassment." Me. Rev. Stat. tit. 17-A, § 15(1)(A)(12). Harassment is defined in the statute as "engag[ing] in any course of conduct with the intent to harass, torment or threaten another person, [a]fter having been notified, in writing or otherwise, not to engage in such conduct" by a law enforcement officer within one year or by a court. Id. § 506-A(1)(A)(1). The notice requirement was met when French was served with the CHN, which tracked the language of § 506-A(1)(A)(1). French does not contest notice. He claims only that the officers lacked probable cause to arrest him.

The undisputed facts show that French used several different communication platforms to call and message Nardone repeatedly despite receiving no response from her.[11] The content of the messages ranged from pleas to talk and attempts to arrange

---

[11] French contends in his brief that "[t]here is no clear evidence that Nardone ever read [French's] messages." The stipulated facts demonstrate, however, that Nardone described the messages she received from French to Drost and provided Drost with screenshots of the messages.

- 14 -

an exchange of property to threatening suicide, inviting Nardone to his funeral, and telling Nardone that he would "find" her. Nardone provided a sworn statement to the Orono Police explaining that French's conduct terrified her. She also reported to the officers that French had been looking for her on the University of Maine campus[12] and that he had followed her to the parking lot of a local store. Those facts, considered in the totality of the circumstances, were sufficient to support a finding of probable cause to believe that French was engaging in a course of conduct with the intent to torment, threaten, or harass Nardone.

French's arguments to the contrary are unpersuasive. He first argues that the officers erroneously misunderstood the CHN as prohibiting all contact, even lawful contact, with Nardone. The record supports that claim, but it does not alter the probable cause analysis, which is based on objective factors and does not

---

[12] French denies this allegation and contends that the officers could not rely on the information to establish probable cause because it was hearsay -- Nardone told the officers that she learned French was looking for her on campus from a friend. We have explained, however, that "hearsay may contribute to the existence of probable cause so long as there is a 'substantial basis' for crediting the hearsay information." United States v. Poulack, 556 F.2d 83, 87 (1st Cir. 1997). Here, the officers found Nardone credible and articulate, and reviewed corroborating messages about the incident from her phone. Hence, the officers were permitted to rely on that information to support their finding of probable cause. See Forest v. Pawtucket Police Dep't, 377 F.3d 52, 57 (1st Cir. 2004) (explaining that officers are entitled to rely upon a "credible complaint by a victim to support a finding of probable cause" without corroborating every aspect of the complaint).

- 15 -

account for the "actual motive or thought process of the officer." Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009) (quoting Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004)).  The issue is whether French's cumulative communications and behavior provided a reasonable basis for the officers to conclude that he engaged in conduct criminalized by the state statute, not whether the officers also took into account some contact that -- viewed in isolation -- actually may have been lawful.

French also contends that the district court's finding of probable cause cannot stand because the court failed to compare the facts known to the officers with the elements of the statute -- including intent -- when assessing probable cause.  However, probable cause is a "fluid concept," and a district court need not engage in an "excessively technical dissection" of the elements supporting probable cause.  Gates, 462 U.S. at 232, 234.  Such a technical assessment confuses probable cause with the standard required to secure a criminal conviction.  Id.

Here, Drost and Merrill were aware of reasonably reliable facts that demonstrated a pattern of unwanted and continued contact that ranged from innocuous to threatening, and they reasonably inferred criminal intent from that objective information.  See Cox v. Hainey, 391 F.3d 25, 34 (1st Cir. 2004) ("[T]he practical restraints on police in the field are great[] with respect to ascertaining intent and, therefore, the latitude

accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great.").

French's attempt to explain away each of the many messages he sent to Nardone -- by claiming he was seeking to exchange property or expressing concern for her wellbeing -- is similarly unpersuasive. Probable cause is based on the <u>totality</u> of the facts and circumstances known to the officers at the time of the arrest. <u>See</u> <u>United States</u> v. <u>Flores</u>, 888 F.3d 537, 544 (1st Cir. 2018) ("Attempting to analyze each piece of evidence in a vacuum is inconsistent with Supreme Court case law, which makes pellucid that each item is to be considered as part of the totality of the circumstances."). Whether French had a seemingly innocent reason for sending a particular message or making a particular call is thus irrelevant. The frequency, content, and context of the messages and calls collectively, in combination with the other facts and circumstances known to the officers -- Nardone's written statement, allegations that French was looking for Nardone on campus, and his following her to a local store -- were adequate to support a finding of probable cause.

In sum, the district court did not err in concluding that the record supported a finding that the officers had probable cause to arrest French for harassing Nardone. Even if that conclusion was debatable -- and for the reasons already explained, we do not think it is -- qualified immunity would attach and

French's claim would still fail. As the district court explained, it is well established that "in the case of a warrantless arrest, if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach." Cox, 391 F.3d at 31. The district court thus properly granted summary judgment in favor of Officer Drost and Sergeant Merrill on French's Fourth Amendment claim arising out of the February 2016 arrest.

**IV.**

In the realm protected by the Fourth Amendment, the "home is first among equals." Jardines, 569 U.S. at 6. To give practical effect to the protection of the home, its "curtilage" -- the area "immediately surrounding and associated with the home" -- is treated as "part of the home itself" and subject to the same heightened protection. Id. (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)). French contends that Officers Morse and Gray violated his Fourth Amendment rights when, in the early morning hours of September 14, 2016, they entered the curtilage of his home, repeatedly knocked on his front door and bedroom window, shouted his name, and urged him to answer the door, all without a warrant and in an attempt to investigate whether he had committed a crime.

The district court agreed that "a fact finder could find that the officers' multiple attempts to persuade [French] to come to the door at an early morning hour, including attempts at a

location other than the front door (i.e., a window of the home),"
went beyond a permissible "knock and talk" and thus violated
French's Fourth Amendment rights. However, the district court
concluded that the unlawfulness of the officers' actions was not
"clearly established" at the time and, thus, that they were
entitled to qualified immunity.

The officers do not challenge on appeal the district
court's finding on the constitutional violation issue. Thus, we
focus our qualified immunity analysis on whether the unlawfulness
of the officers' conduct was "clearly established" at the time of
the events in this case.

A violation of "clearly established" law means that the
law rendering the officers' conduct unlawful was "sufficiently
clear" at the time such that a "'reasonable official would
understand that what he is doing' is unlawful." District of
Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Ashcroft v.
al-Kidd, 563 U.S. 731, 741 (2011)). In other words, the
unconstitutionality of the officer's conduct must be beyond debate
in light of an existing principle of law "dictated by 'controlling
authority' or 'a robust consensus of cases of persuasive
authority.'" Id. at 589-90 (quoting al-Kidd, 563 U.S. at 741-42).

The existing legal principle need not be derived from a
case "directly on point," but precedent must "place[] the statutory
or constitutional question beyond debate." White v. Pauly, 137 S.

- 19 -

Ct. 548, 551 (2017) (per curiam) (quoting <u>Mullenix</u> v. <u>Luna</u>, 577 U.S. 7, 12 (2015)); <u>see</u> <u>also</u> <u>Taylor</u> v. <u>Riojas</u>, 141 S. Ct. 52, 53-54 (2020) (per curiam) (reversing the Fifth Circuit's conclusion that the officers were not given "fair warning" that "prisoners could not be housed in cells teeming with human waste for only six days" because, even though there was no controlling precedent directly on point, "no reasonable correctional officer could have concluded that . . . it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time").  To that end, general statements of the law may give "'fair and clear warning' to officers" so long as, "in the light of the pre-existing law[,] the unlawfulness [of their conduct is] apparent."  <u>White</u>, 137 S. Ct. at 552 (first quoting <u>United States</u> v. <u>Lanier</u>, 520 U.S. 259, 271 (1997); then quoting <u>Anderson</u> v. <u>Creighton</u>, 483 U.S. 635, 640 (1987)); <u>see</u> <u>also</u> <u>Hope</u> v. <u>Pelzer</u>, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").  A rule is too general, however, "if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'"  <u>Wesby</u>, 138 S. Ct. at 590 (quoting <u>Anderson</u>, 483 U.S. at 641).

Against that backdrop, we conclude that, in light of <u>Jardines</u> and the nature of the conduct here, taken as whole, no

reasonable officer could have thought that what the Orono police did was consistent with the Fourth Amendment. To understand why, we first review Jardines; we then turn to the facts of this case.

## A. **Florida v. Jardines**

In Jardines, the Miami-Dade Police Department received a tip that the defendant was growing marijuana in his home. 569 U.S. at 3. After surveilling the home for a period of time, two officers entered the curtilage with a drug-sniffing canine ("K-9"). Id. at 4. On the defendant's front porch, the dog alerted to the presence of drugs. Id. Based on the dog's signaling, the officers applied for and secured a search warrant. Id. Upon executing the warrant, the officers discovered several marijuana plants in the defendant's home and charged the defendant with drug trafficking. Id. At trial, the defendant sought to suppress the marijuana evidence as the fruit of an unlawful search. Id. at 4-5. The trial court granted the motion and the state appellate court reversed. Id. at 5. The Florida Supreme Court then reversed the appellate court and the United States Supreme Court granted certiorari. Id.

Justice Scalia, writing for the majority, labeled the case as "straightforward." Id. The officers entered a constitutionally protected area -- the curtilage of the home -- without a warrant to investigate the commission of a crime and, hence, the Fourth Amendment was implicated. Id. at 6-7. Whether

- 21 -

the Fourth Amendment was violated, the Court explained, required an assessment of whether the officers' investigation in a constitutionally protected area "was accomplished through an unlicensed physical intrusion." Id. at 7. In the Court's words, "an officer's leave to gather information is sharply circumscribed when he steps off [public] thoroughfares and enters the Fourth Amendment's protected areas." Id. Because it was undisputed that the officers "had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question" for the Court was "whether [the homeowner] had given his leave (even implicitly) for [the officers] to do so." Id. at 8.

Focusing on implicit consent, the Court recognized that a license to enter another's property may be implied "from the habits of the country." Id. (quoting McKee v. Gratz, 260 U.S. 127, 136 (1922)). Indeed, "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." Id. (quoting Breard v. City of Alexandria, 341 U.S. 622, 626 (1951)). That implicit license, the Court explained, "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. The Court underscored the simplicity of that license, explaining that "[c]omplying with

- 22 -

the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." Id. For that reason, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" Id. (quoting Kentucky v. King, 563 U.S. 452, 469 (2011)).

The Court went on to find that the officers exceeded the scope of the implicit social license there because they "introduc[ed] a trained police dog to explore the area around the home in hopes of discovering incriminating evidence," and "[t]here is no customary invitation to do that." Id. at 9. The Court explained that the license implied by societal norms that invites a visitor to the front door to knock and attempt to speak with the occupant does not extend "[a]n invitation to engage in canine forensic investigation" in the curtilage of the home. Id. The Court concluded that, although the officers in Jardines remained within the physical area covered by the license, their behavior exceeded that "which . . . anyone would think he had license to do" while on the property of another. Hence, they exceeded the scope of the implicit license authorizing their entry onto the curtilage. Id. at 10.

As Justice Scalia put it: "To find a visitor knocking on the door is routine (even if sometimes unwelcome) [but] to spot

that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police." Id. at 9. Because the officers "learned what they learned only by physically intruding on [the] property to gather evidence" without a warrant and in excess of any implied license to do so, they violated the Fourth Amendment. Id. at 11. Again commenting on the simplicity of the rule, the Court observed that "[o]ne virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." Id.

## B. Applying Jardines

### 1. The Unconstitutional Conduct of the Officers

Officers Morse and Gray arrived at French's home shortly before 5:00 a.m. They observed lights on in the home and decided to conduct a "knock and talk" rather than immediately apply for a warrant. The officers entered the property, walked onto the front porch, knocked on the front door, and announced that they were police officers seeking to speak with French. No one answered and the officers left the property.[13] At this point, there was nothing constitutionally infirm about the officers' conduct, which was expressly permitted by the "knock and talk" exception to the warrant requirement. Morse and Gray initially did no more than a

_____

[13] Although Officer Morse was wearing a body camera, it did not record the initial knock and talk.

- 24 -

member of the public might be expected to do -- enter the curtilage, knock on the front door seeking to speak with an occupant, wait to be received and, receiving no response, leave. See id. at 9-10. Because this behavior was consistent with the conduct permitted by the implied social license, the officers' initial entry onto the curtilage was lawful. Thus, we focus our clearly established law analysis on the conduct of the officers in the wake of that first lawful entry onto the curtilage, and consider it in totality. It is that conduct in the aggregate that requires the conclusion that the officers violated clearly established law.

After the initial attempted knock and talk, Officers Morse and Gray left the property. Morse went to speak with Nardone, and Gray stayed near French's home to surveil the property. While watching the property, Gray walked onto the neighbor's adjacent driveway, which provided an unobstructed view of the narrow strip of grass, the bedroom window, and the cellar window of French's home. From there, Gray observed a young man peering out the basement window. Then, still standing on the neighbor's driveway, Gray shined his flashlight through the window, which caused the young man to cover the window and turn off the basement lights. Gray then returned to the front porch of French's building and again knocked on the front door, but no one answered. The knocking apparently caused a dog in the home "to

- 25 -

bark frantically."  At that point, Gray's incident report recounts that "still no one came to the door.  More lights were quickly being turned off in the residence.  Window coverings which looked like blankets were drawn over the open windows as well."[14]

Morse then returned from Nardone's apartment and, along with the two Old Town police officers (Detective Fearon and Officer Orr), joined Gray off the property but near French's building.  Instead of honoring the clear signals that the occupants of the home did not wish to receive visitors, Morse walked back onto the property and, peering through a drawn window covering, saw that a light remained on in the kitchen.  Morse then rejoined the other officers and told them that he would return to the station to apply for a search warrant.  Fearon suggested that the officers attempt another "knock and talk," to which Morse responded that he and Officer Gray "had already knocked" and that "[he] didn't think that . . . French would respond."  See Affidavit of Travis Morse, Dkt. No. 35-22.

Ignoring Morse's hesitation and suggestion that the officers should apply for a search warrant, the officers persisted

---

[14] In his incident report, Gray states that Morse was still at French's residence when Gray noticed the young man peering out of the basement window and that Morse and Gray proceeded to knock on the front door a second time together.  In his sworn affidavit submitted to the district court, however, Gray explains that Morse had already left to speak with Nardone when Gray proceeded to knock a second time.  Morse's affidavit also confirms that fact.

in their efforts to get French to come out of his home.[15] This time, Fearon and Morse went to the left side of the house, walked through the curtilage along the narrow strip of grass and located what they had reason to believe was French's bedroom window.[16] They knocked forcefully on the window frame and yelled for French to come out and talk. Fearon also shined his light into the bedroom. At the same time, Officer Gray returned to the front porch, knocked on the front door, and told French to come outside.

The simultaneous knocking apparently caused the dog inside the home to start barking loudly again. At some point, Andrews finally answered the front door and, after a brief discussion with Gray, agreed to look for French. According to French's affidavit, Andrews decided to answer the door because he was afraid that the police would break the door down, which would cause his dog to become defensive and could result in the police shooting the dog. A short while later, French, feeling as though he "had no choice," came to the door.

By the time French came to the door, the officers had entered his property four times. The first entry occurred when

---

[15] Officer Orr agreed to canvass the area to see if she could locate French and did not return to French's residence until after he was arrested.

[16] The officers believed that window was in French's bedroom based on a visit to the residence in November 2015 that involved French.

Morse and Gray initially approached French's residence by the front path, knocked on the front door, and asked French to come to the door. The second occurred when Gray, after he shined his flashlight through the basement window from the neighbor's driveway and saw a young man looking out, again approached the home by the front path, knocked on the front door, and asked French to come to the door. This second entry caused the occupants of the home to quickly turn off lights and cover windows. The third entry involved only Officer Morse when, after returning from Nardone's residence, he reentered the property, peered through a drawn window covering, and saw a light on in the kitchen. Morse then rejoined the other officers and recommended applying for a warrant, but Detective Fearon suggested that they try again. On the fourth entry, Morse and Fearon walked through the curtilage of French's home, located his bedroom window, knocked on the window frame, and asked him to come out, while Gray reentered the property by the front path, knocked on the front door, and asked French to come to the door.

## 2. Violating Clearly Established Law

While the officers' conduct does not involve the gathering of evidence from the curtilage of French's home with the help of a dog, it does plainly demonstrate that, if we consider their actions as a whole, they exceeded the scope of the implicit social license that authorized their presence on French's

property.  Despite obvious signs that the occupants of the home were aware of and did not want to receive visitors -- their refusal to answer the door upon Morse and Gray's initial knock and Gray's second knock, and their swift covering of windows and turning off lights in response to that second knock -- the police doubled down on their efforts to coax French out of the home.  Any reasonable officer would have understood that their actions on the curtilage of French's property exceeded the limited scope of the customary social license to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."  Jardines, 569 U.S. at 8.  Indeed, Officer Morse revealed such an understanding when he observed that French was not likely to come to the door upon another attempt and that the officers should secure a warrant.  Yet, the officers disregarded Morse's advice and reentered the curtilage without a warrant.

Once back in the curtilage, the officers then upped the ante in their attempts to convince French to come out of his home by, among other things, continuing to knock on his front door, locating and knocking on his bedroom window frame, and yelling for him to come out of his home.  The officers could not reasonably have thought that an invitation to engage in such conduct "inhere[s] in the very act of hanging a knocker" on the front door, id. at 9, or that their actions were "no more than [what] any

private citizen might do," id. at 8 (quoting King, 563 U.S. at 469). There is no implicit social license to invade the curtilage repeatedly, forcefully knock on the front door and a bedroom window frame, and urge the residents to come outside, all in pursuit of a criminal investigation. As such, the officers' behavior was plainly inconsistent with Jardines, which clearly established that an implicit social license sets the boundaries of what acts officers may engage in within the curtilage of the home, absent exigent circumstances.[17] See id. at 8-10; see also King, 563 U.S. at 469-470 ("When law enforcement officers who are not armed with a warrant knock on a door . . . the occupant has no obligation to open the door or to speak. . . . And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time."); Hopkins v. Bonvicino, 573 F.3d 752, 765 (9th Cir. 2009) ("The mere fact that [the defendant] did not answer the door cannot tip the balance in the officers' favor, since nothing requires an individual to answer the door in response to a police officer's knocking." (citations omitted)).

The officers' attempts to undercut the straightforward application of Jardines to this case are unpersuasive. They first

_____

[17] The officers do not claim that their conduct was justified by exigent circumstances and, as we shall explain, the dissent's exigent circumstances argument was not made below or on appeal.

argue that Jardines could not have clearly established the unlawfulness of the officers' conduct because an officer reading Jardines should anticipate only that, "if he or she brings a trained drug-sniffing K-9 onto the porch or otherwise into the curtilage of a residence without a warrant or consent of the homeowner, then the officer may be liable for an unlawful search." Their argument reflects the untenable position that clearly established law requires cases with practically identical facts. The majority in Jardines made clear that "[i]t [was] not the dog that [was] the problem" there. 569 U.S. at 9 n.3. The drug-sniffing K-9 was significant in Jardines because the officers used the dog to "gather[] information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house . . . . And they gathered that information by physically entering and occupying the area to engage in conduct [a search for evidence of a crime] not explicitly or implicitly permitted by the homeowner." Jardines, 569 U.S. at 5-6. Indeed, the Court added, "[w]e think a typical person would find it a cause for great alarm . . . to find a stranger snooping about his front porch with or without a dog." Id. at 9 n.3 (internal quotation marks omitted).

Here, as we have explained, the conduct "not explicitly or implicitly permitted by the homeowner" was the officers' repeated reentry onto the property and the aggressive actions taken by the officers. In Jardines and here, police officers not armed

- 31 -

with a warrant engaged in conduct in pursuit of a criminal investigation within the curtilage that was inconsistent with the implied social license pursuant to which an officer may enter the curtilage of a home. See id. at 8-9 ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' . . . . [T]he background social norms that invite a visitor to the front door do not invite him there to conduct a search." (quoting King, 563 U.S. at 469)).

The officers also argue that a rule abstracted from Jardines is too general and "fails to appreciate the myriad different circumstances law enforcement officers are confronted with in the field." The officers point to conflicting cases in the wake of Jardines that involve either one or some combination of the factors present in this case. For example, the officers cite disagreement regarding (1) whether a knock and talk conducted early in the morning is inherently unlawful, see, e.g., United States v. Lundin, 817 F.3d 1151, 1159 (9th Cir. 2016) (explaining that the officers knocked "around 4:00 a.m. without evidence that [the defendant] generally accepted visitors at that hour, and without a reason for knocking that a resident would ordinarily accept as sufficiently weighty to justify the disturbance"); Young v. Borders, 850 F.3d 1274, 1286 (11th Cir. 2017) (Hull, J., concurring) (rejecting the dissent's assertion that an officer

"exceeded the scope of the permissible knock and talk exception because it was 1:30 a.m., he unholstered his weapon, and he knocked so loudly"); (2) whether officers may survey the curtilage for a different entry to the home if a knock and talk at the front door is unsuccessful, see Carroll v. Carman, 574 U.S. 13, 20 (2014) (per curiam) (holding that it was not beyond debate whether officers conducting a knock and talk may knock at any entrance open to visitors rather than just the front door); (3) whether knocking for more than a few minutes violates the knock and talk rule, see United States v. Carloss, 818 F.3d 988, 998 (10th Cir. 2016) ("We decline to place a specific time limit on how long a person can knock before exceeding the scope of th[e] implied license."); (4) whether more than one knock and talk can be attempted in a limited time period, see United States v. Walker, 799 F.3d 1361, 1362-64 (11th Cir. 2015) (finding it was reasonable for officers to make a third attempt to knock and talk at 5:00 a.m. where the first two knocks had elicited no response and were conducted the prior evening -- at 9:00 p.m. and at 11:00 p.m. -- and the officers observed lights on in the home and in a car parked outside before reentering the property); and (5) whether the number of officers present matters, see United States v. White, 928 F.3d 734, 741 (8th Cir. 2019) ("[W]e fail to see why the number or type of officers in this case would render the second entry impermissible.").

Those cases do not detract from the clarity of Jardines' application in this case. We are not concerned only with the number of officers present or the hour, location, or length of the attempted knock and talks. Instead, we are focused on the legal principle at the core of Jardines -- the scope of the implied license to enter the curtilage -- and the application of that principle to the conduct of the officers in totality. Here, as in Jardines, the officers had their feet "firmly planted on the constitutionally protected extension of [the] home" and their activity was therefore limited to that which was implicitly authorized (absent explicit consent) by the homeowner. Jardines, 569 U.S. at 7. It does not take "fine-grained legal knowledge" to understand that the officers' actions in this case exceeded the implicit authorization to enter the property of another without a warrant. See id. at 8. Far from engaging only in conduct that a homeowner might reasonably expect from a private citizen on their property -- that is, again, approaching the door, knocking promptly, and leaving if not greeted by an occupant -- the officers reentered the property four times and took aggressive actions until French came to the door so that the officers could pursue their criminal investigation. By so doing, the officers engaged in precisely the kind of warrantless and unlicensed physical intrusion on the property of another that Jardines clearly established as a Fourth Amendment violation. Hence, the officers

violated clearly established law and are not entitled to qualified immunity.

## C. The Dissent

There are two major problems with the dissent. It goes to great lengths to make an exigent circumstances argument that the appellees never make. It also fails to address the principle at the heart of Jardines: the scope of the knock and talk exception to the warrant requirement is controlled by the implied license to enter the curtilage.

### 1. Exigent Circumstances

The dissent tries to portray this case as one involving exigent circumstances requiring the officers to act quickly "to ensure the safety of a victim or prevent the destruction of evidence." The exigent circumstances doctrine is a narrow exception to the "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Groh v. Ramirez, 540 U.S. 551, 559 (2004) (quoting Payton v. New York, 445 U.S. 573, 586 (1980)). "[O]fficers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," Brigham City v. Stuart, 547 U.S. 398, 403 (2006), or when doing so "is reasonably necessary to head off the imminent loss of evidence," United States v. Almonte-Báez, 857 F.3d 27, 33 (1st Cir. 2017). Officers must carry the heavy burden of

identifying an "objectively reasonable basis" for believing that "there [wa]s such a compelling necessity for immediate action" that the delay of obtaining a warrant could not be tolerated. Id. at 32-31 (first quoting United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005); then quoting Matalon v. Hynnes, 806 F.3d 627, 636 (1st Cir. 2015)).

The officers do not, however, argue on appeal -- and they did not argue in their summary judgment motion below -- that their actions were justified by exigent circumstances. The officers do not claim that the safety of Nardone or the risk that evidence would be destroyed was so acute that delay to seek a warrant could not be tolerated. There is a single passing reference to exigent circumstances in the appellees' briefing. It appears in a parenthetical to a case citation and serves as a mere description of the circumstances of the case cited.[18] As we have said, "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work,

---

[18] In support of their argument that Jardines is ambiguous, the officers pose a series of questions they contend are unanswered by Jardines, each of which is followed by case citations allegedly showing disagreement as to the answer. It is in that context that the officers make their single ancillary reference to exigent circumstances: "How loudly may an officer knock? See Kentucky v. King, 563 U.S. 452, 468-69, 131 S. Ct. 1849, 1861 (2011) ('Police officers may have a very good reason to announce their presence loudly and to knock on the door with some force. A forceful knock may be necessary to alert the occupants that someone is at the door.') (discussing exigent circumstances exception to warrant requirement)." Appellee's Br. at 37.

create the ossature for the argument, and put flesh on its bones."
United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). We see
no reason here to depart from the well settled rule that "issues
adverted to in a perfunctory manner, unaccompanied by some effort
at developed argumentation, are deemed waived."[19]  Id.

The dissent also seems to suggest that even if the
circumstances of this case did not amount to a true emergency
justifying application of the exigent circumstances exception to
the warrant requirement, the nature of the exigencies involved
expanded the scope of the license for the officers to enter
French's property to conduct a knock and talk. That argument
conflates the knock and talk and exigent circumstances exceptions.
Whereas the scope of the exigent circumstances exception is case-
specific and varies based on the nature of the exigency and the
severity of the underlying crime, see Welsh v. Wisconsin, 466 U.S.

---

[19] To be sure, the officers were justifiably concerned about
Nardone's wellbeing given her credible accounts of French's
conduct that evening and throughout the entirety of his
relationship with her. But the officers plainly do not argue that
there was such an imminent risk that French would harm Nardone or
destroy evidence that they were justified in dispensing with the
warrant requirement on that ground, such that they could exceed
the social license recognized in Jardines. See generally Williams
v. Maurer, 9 F.4th 416, 435-36 (6th Cir. 2021) (holding that a
reasonable jury could find no exigent circumstances where the
officers "respond[ed] to a report of a [possible domestic]
disturbance, [but] when they arrived on the scene, there was no
indication of a tumultuous situation in [the] home and [they] did
not witness any violent behavior inside the apartment").

740, 750 (1984), the scope of the knock and talk exception is limited to the implied social license to enter the property of another regardless of the nature of the suspected crime of interest to the officers, see Jardines, 569 U.S. at 8 ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" (quoting King, 563 U.S. at 469)).  The dissent fails to point to any case law suggesting otherwise.[20]

## 2. The Scope of the Implied Social License to Conduct a Knock and Talk

The dissent claims that Jardines cannot have clearly established the unlawfulness of the officers' conduct in this case because the Court's reasoning in Jardines was dependent upon the fact that the officers entered the property with a drug-sniffing dog "to gather information on the curtilage, not to speak with a resident."  According to the dissent, because the officers in this case entered the property with an intent to speak to French and

---

[20] The dissent also suggests that the scope of the implied license to conduct a knock and talk might vary "when officers are investigating a crime for which state law authorizes a warrantless arrest."  But that consideration is irrelevant.  Probable cause to arrest a suspect, even if that is all that is required under state law, cannot overcome the protections that the Fourth Amendment affords to a person inside his or her home under federal law.  See, e.g., Morse v. Cloutier, 869 F.3d 16, 23 (1st Cir. 2017) ("Arresting a suspect inside his home without a warrant violates the Fourth Amendment unless some 'well-delineated exception[]' shields the intrusion." (quoting United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004) (alteration in original)).

not to engage in a search with a drug-sniffing dog, Jardines is inapposite. The dissent's attempt to limit Jardines to its facts ignores the animating principles of Jardines[21] -- and the reason Justice Scalia labeled the case "a straightforward one." Id. at 5. It also ignores the Court's insistence that it was not the dog that was the problem in that case.[22] See id. at 9 n.3.

To reiterate, the constitutional violation in Jardines was the officers' "physical[] ent[rance] and occup[ation]" on the curtilage of Jardines' home "to engage in conduct not explicitly or implicitly permitted by the homeowner." Id. at 6. Because there was no explicit permission by Jardines, the Court reasoned that the officers' permission to enter the property was authorized

---

[21] The dissent unconvincingly tries to dismiss Jardines' explanation of the scope of the implied social license as mere dicta. But the Court's careful consideration of the contours of the implied license, and whether the officers' conduct on Jardines' curtilage was authorized by that license, was crucial to its holding that the officers violated the Fourth Amendment.

[22] The dissent also tries to disaggregate the conduct of the officers and argues that, because Detective Fearon is not a defendant in this case, his actions should not be taken into account in determining whether Morse and Gray violated French's Fourth Amendment rights. But that approach ignores the fact that Fearon, Morse, and Gray acted in concert while pursuing the investigation of French in the curtilage of the residence. It may have been Fearon who suggested that the officers attempt another knock and talk before applying for a warrant and he may have been the first one to knock on French's window, but Morse and Gray agreed with his proposal, participated in the final re-entry on French's property, and Morse joined Fearon in knocking on French's bedroom window. Hence, carving out Fearon's conduct accomplishes nothing in terms of Morse and Gray's liability in this case.

by an implicit social license -- informed by "the habits of the country" -- to enter the property of another and seek to speak with an occupant. Id. at 8 (quoting McKee v. Gratz, 260 U.S. 127, 136 (1922) (Holmes, J.)). That license, the Court explained, has both a physical and a purpose-based limitation. Id. at 9. In other words, its scope "is limited not only to a particular area but also to a specific purpose," both of which are defined by what a homeowner might reasonably expect from a private citizen on the homeowner's curtilage. Id. at 9. The Court concluded that the officers abided by the terms of the physical scope of the license -- their activities on the property were limited to areas that a member of the public might be expected to visit. However, the officers in Jardines exceeded the limited purpose authorized by the license through their conduct. They did so by seeking evidence of drugs with the help of a trained, drug-sniffing dog.

That the precise manner in which the officers in this case exceeded the scope of the implied license differs from that in Jardines is inconsequential. The officers in this case, like the officers in Jardines, in the absence of any license to do so, "physically intrud[ed]" on a suspect's property repeatedly and engaged in intrusive conduct that no reasonable visitor could have understood as impliedly authorized by a resident. Id. at 11. The dissent portrays the officers' final, unlicensed entry on French's property as a mere attempt to conduct a knock and talk. That

portrayal is unsupported by the record, given the contentious and invasive conduct of the officers described above.

The dissent's attempt to detract from the clarity of Jardines by invoking Carroll v. Carman, 574 U.S. 13 (2014) (per curiam), and United States v. Walker, 799 F.3d 1361, 1364 (11th Cir. 2015) (per curiam), is unpersuasive. In Carroll, instead of knocking at the front door, officers traveled to the back of a home and knocked at a sliding glass door that opened onto a ground-level deck. 574 U.S. at 14. The Supreme Court held that it was not clearly established that the officers were prohibited from knocking "at an[] entrance that is open to visitors . . . [other] than . . . the front door." Id. at 20. Here, our case involves officers knocking on an occupant's bedroom window and not "an[] entrance" other than the front door "that is open to visitors." See id.

Walker is similarly inapposite. There, officers attempted three knock and talks over a span of about eight hours. 799 F.3d at 1362. The officers first knocked at around 9:00 p.m. and received no response. Id. They left and returned around 11:00 p.m. and noticed a car was parked outside of the home that had not been there during their first attempt. Id. The officers knocked again but saw no indication that anyone was inside of the home. Id. The following morning, around 5:00 a.m., the officers drove by the property and noticed that some lights were on in the home

and inside of the vehicle parked outside. Id. With the recognition that someone was likely now in the home, the officers approached a third time. See id. Before they could knock on the door, however, the officers noticed a man inside of the vehicle with his head resting on the steering wheel. Id. The officers knocked on the car window to determine who the man was and whether he needed medical attention. Id. Nowhere in Walker is there any suggestion that the officers engaged in the kind of aggressive conduct that we have described here.

As we have already explained, we are not concerned with isolated facts like those presented in Carroll and Walker -- i.e., the number of officers present or the hour, location, or length of the attempted knock and talks -- and whether those facts alone might have supported a finding that the officers violated clearly established law. We are concerned only with Jardines' clear prohibition on the officers' conduct in this case which, as we have explained, plainly exceeded the scope of the implied license to enter the curtilage of French's home.[23]

---

[23] The dissent's notion that a neighbor -- let alone a group of strangers visiting a home at 5:00 a.m. -- may, under the implied social license, repeatedly knock on the front door, peer through a drawn window covering, shine a flashlight through windows in the home, and knock on a bedroom window frame, all while yelling for the occupant to come outside, strains credulity and is contrary to Jardines.

## V.

In sum, we agree with the district court that Officers Drost and Merrill had probable cause to arrest French for harassment in February 2016 and, even if they did not, the question of probable cause was debatable such that the officers were entitled to qualified immunity. We therefore affirm that aspect of the district court's summary judgment ruling.

As to the September 2016 incident, we conclude that, viewing the summary judgment evidence in the light most favorable to French, Officers Morse and Gray violated French's Fourth Amendment rights by exceeding the lawful bounds of a warrantless "knock and talk." We further conclude that the unlawfulness of the officers' conduct was clearly established at the time by the principles of law set forth in Florida v. Jardines. Accordingly, we reverse the district court's grant of summary judgment as to Count IX and remand for further proceedings consistent with this opinion. Each party is to bear its own costs. See 1st Cir. R. 39(a)(4).

So ordered.

**-Dissenting Opinion Follows-**

**LYNCH**, <u>Circuit Judge</u>, **dissenting in part.** I join the majority opinion as to the affirmance of summary judgment arising from claims about the February arrest of Christopher French. I strongly dissent from the reversal of the grant of qualified immunity to Officers Gray and Morse as to the September 14 incident. In my view, the majority is wrong that <u>Florida</u> v. <u>Jardines</u>, 569 U.S. 1 (2013), which concerned officers' entry onto private property for the purpose of using a drug-sniffing dog on the curtilage of the house, clearly established the purported illegality of the officers' conduct in knocking at French's home on September 14, 2016.

The doctrine of qualified immunity has sometimes been abused, but the majority's denial of qualified immunity here is flatly contrary to Supreme Court and circuit law and creates a circuit split. Moreover, this unfortunate ruling will disincentivize police from taking action after persons of any gender have credibly alleged that they have been threatened and are frightened by former romantic partners.

When they approached French's home, Officers Gray and Morse were responding to an urgent and potentially dangerous situation. French had twice that night broken into Samantha Nardone's house and had stolen her phone from her bedside table, Nardone had previously called the police for help in dealing with French's harassment of her, and Nardone told the officers that she

was scared of what French might do if he accessed the contents of her phone.  Given these circumstances and the state of the law in 2016, the officers' choice to knock several times at French's door and window shortly after the second break-in was reasonable.  Nothing in Jardines clearly established otherwise.  The officers in this case acted sensibly and with restraint, and most certainly should not be deprived of qualified immunity and sent back to face damages claims against them, as the majority holds.

## I.

The following key facts of the September 14, 2016, encounter are those which would have been understood by any reasonable officer in the shoes of Officer Morse, the lead officer, and Officer Gray.  These facts reveal why the majority is wrong in its reading of Jardines and its conclusion that the law was clearly established as to the implied license analysis.  The facts also demonstrate why the two officers are clearly entitled to qualified immunity.

The supposed violation of French's Fourth Amendment rights occurred sometime around 5:00 or 5:30 AM on September 14, 2016.  This is what the officers knew at the time.

### A. The Officers' First Visit to 60 Park Street.

The victims, Samantha Nardone and her roommates, called the police department at or around 3:19 AM on September 14, 2016, to report that their residence had been broken into.  Nardone also

reported that her phone, which she had placed on her nightstand before she went to sleep around 12:30 AM, was missing.

Officers Morse and Gray were dispatched immediately to Nardone's residence at 60 Park Street in Orono, Maine. Both officers were familiar with the history between French and Nardone and knew that Nardone had several times in the past called the Orono Police Department because of problems with French. Morse was familiar with French because he, accompanied by Officer Barrieau, had arrested French in November 2015 for violating his conditions of release. From this prior incident, Morse knew that French lived at 13 Park Street, a nearby multi-tenant house about .2 miles from Nardone's house. He knew French did not live in a single-family house. He also knew that French's room in that house was on the first floor to the left of the front door. He had spoken with other officers about French multiple times. Gray testified at his deposition that he was familiar with French's name in September 2016 and that it was "highly likely" he had read French's previous arrest records.[24]

---

[24] Nardone wrote in her police statement about the February incident that she had gotten in an altercation with French and he would not leave her home when she asked him to. She reported that he tried to put her in a headlock, and she pushed him away. She told him he had ten minutes to collect his items from her home before she called the police. She was concerned for her safety, so she locked herself and her roommates into one of the bedrooms. French began jiggling the lock and started using a card to pop it open. They held the knob so he could not pop it open. Moments

On the way to Nardone's house, Morse saw that lights were on at French's house at 13 Park Street. When the officers arrived, Nardone told them that she suspected French of breaking in and taking her phone. She explained that French had stolen her keys the previous week and still had them, though she had since changed the locks. When she noticed her phone was missing, she found that all of the doors she had locked before going to bed were now unlocked.

Nardone stated that she was afraid French would do something to her if he gained access to her phone and read what was on it. She later added that "if he gets in [the phone], I'm fucked." Nardone explained that she had put a passcode on her cellphone, but that the passcode she had chosen was not secure and that she thought he would be able to crack it. She thought that if French had the phone he was "obviously gonna run" from his apartment so that he would have time to look through the phone. She said she was scared he would break in again that night and wrote in her victim statement that she had reason to believe French "would do it again (now/tonight)." Nardone also told the officers she thought French might be drunk or on drugs because he was "obviously fired up."

---

later, Nardone heard a "huge smash downstairs," ran down, and saw "the TV was shattered face down on the floor."

Nardone told the police numerous good reasons for her fear, including the events of that very night, of the prior week, and from before that. Nardone explained that earlier in the night on September 13, 2016, Nardone had run into French in a chance encounter at the Roost, a local lounge. There, French came up to her and they exchanged words; the interaction made her feel uncomfortable in remaining there. So she left around 10:30 PM.

Nardone later drove over with her roommate Alicia McDonald to see a friend who lived nearby. After the visit, the two women attempted to drive home. French found them and stood in the middle of the road to force them to stop. He yelled and swore at Nardone, asking her where she had been, and accused her of drunk driving. As Nardone tried to drive away, French jumped onto her car.

As the police report recounts, "[o]nce Nardone made it home she and McDonald locked all the doors and windows in fear that French would come to their residence." Nardone checked her phone and saw she had nine missed calls from a blocked number -- which she had reason to believe were from French -- and eleven messages from French. Nardone had blocked French on all her social media accounts and on her email and phone but was still receiving messages from French on the "First Class" University of Maine platform that she had been unable to block him on. French had previously harassed her with calls from a blocked number in the

- 48 -

hours after being served a Cease Harassment Notice on February 18, 2016. On her roommate's advice, Nardone did not read the messages. She told Morse she was "so freaking scared" when she went to bed. Before falling asleep, she placed the phone on her nightstand. Nardone woke up around 3:00 AM and saw that her phone was missing. That was when she discovered that all the doors she had locked before going to bed were now unlocked.

As to the prior week, Nardone explained to the officers that she had broken up with French six days before, on September 8, 2016. That night, French had broken into Nardone's home and stolen her keys and laptop. The following morning, Nardone noticed that her laptop was gone, went to French's house to look for it, and saw that her laptop was open on his bed and that he had been going through her iMessages on her laptop. The next day, on Saturday, September 10, Nardone went out with friends. Walking towards a local bar, they saw someone watching them from the kitchen window of French's house. When she returned home later, her car keys and a spare key on her windowsill had disappeared, and she had not been able to find them since. She told the officers she suspected French had taken her keys a second time, so she had changed the locks.

Nardone also told the officers that on a different, previous occasion, French had taken Nardone's keys and she had been afraid he would break in. The hardware store was closed so

she could not change her locks that night, so French's roommates put sensors on French's doors and windows so that they would be alerted if French left and they could warn Nardone. Nardone was scared enough that night that she piled up furniture in front of her bedroom door to make sure French could not get in. She changed her locks the following day.

While the officers were at Nardone's apartment on September 14, her roommate Jennifer Prince found that an upstairs bathroom window had been opened and the items in the windowsill knocked to the floor, indications that the window was the entry point. Officer Morse took photographs of the window. Morse also asked dispatch to arrange a "ping" on Nardone's phone with the cellphone carrier to see if they could find out whether the phone was at 13 Park, French's residence.

The officers left Nardone's home at approximately 4:26 AM. Shortly before leaving, they asked Nardone if she would feel safe staying at the apartment. She repeated that she would not feel safe if French got into her phone. They returned to the police station to try to "ping" Nardone's phone to find its location and figure out if it was at French's apartment. Nardone had told them that she had tried to use iCloud to locate her phone, but the phone had been turned off and so she could not locate it.

B. <u>French's Second Break-In to Nardone's House</u>

The fears which Nardone reported about French again trying to break in that same night came true. At 4:43 AM, Nardone called the police a second time and reported that French had come back to her apartment. He entered through the front doorway, but only got to the mudroom when the screams of Nardone's roommates stopped his entry and caused him to flee.

Gray and Morse were dispatched again. While on their way, dispatch told them that French had been seen running down the road towards his home at 13 Park. They stopped at 13 Park on the way and saw that there were lights on in the house. They knocked on French's door. Nobody responded, so the officers left the porch. The officers decided that Gray should stay on the road near 13 Park while Morse went back to Nardone's residence at 60 Park to gather the account of its residents first-hand. Gray walked down the driveway to the left of 13 Park and saw a man peering out of the basement window of the building. Gray knocked a second time on French's door.

Officers James Fearon and Melissa Orr from the Old Town Maine Police Department were sent to join Morse at 60 Park. Nardone and her roommates explained that French had broken in again and that he was yelling that he needed help with his puppy. Nardone stated that French was probably waiting for the police to leave and her roommate said French would probably return "the second

[the police] leave." Morse asked if there was somewhere else that they could go and encouraged them to go elsewhere for the rest of the night.

That is what the officers knew of French's criminal activities that night when they decided to return to 13 Park. Among other things, they had every reason to believe (1) French was a threat to Nardone and her roommates; (2) he had expressed his anger in many ways toward them; (3) they had to move quickly, particularly as he might read the email and messages on Nardone's phone; (4) they had to move rapidly to prevent not just harm to Nardone and her roommates, but the destruction of evidence: the cell phone, the stolen keys, and whatever else he had taken, all evidence of his break in; and (5) he had run down the street back to his room and was still awake.

## C. The Officers' Second Visit to French's Apartment

Morse and Fearon returned to French's home. The officers discussed the best approach to finding and questioning French. They felt they had probable cause and discussed seeking a warrant. To obtain a warrant, the officers would have to return to the police station and prepare an application and request for a warrant. They estimated that would take at least half an hour once back at the station. They then would have to drive to a nearby town to get a judge to sign the warrant.

They discussed a further attempt at a knock and talk and, if French appeared, questioning him. They had observed that the lights which had been on were quickly turned off and the windows were covered, confirming the view that someone was up and awake. Morse explained to the other officers that he and Gray had tried a knock and talk earlier on the first trip to 13 Park and had gotten no response. Fearon, who is not a defendant (and whose actions cannot be attributed to Morse and Gray) expressed his view that they should attempt again to knock and talk.

The decision to proceed not with a warrant, but with a knock and talk, in Gray's view, was based on the fact that it was faster and easier. Gray stated that "if we believe somebody is inside of the residence and we're looking to speak with that individual and we have facts and circumstances surrounding the situation that lead us to believe that he is inside of the residence, we can knock to attempt to have that subject come out and speak with us." Gray also stated that the appropriate place to knock "depends on where the person that you're trying to contact resides within the dwelling" and that he believed it was permissible to bang on a window.

As to Morse, he stated at his deposition that he was unaware of any standards that place limits on what time of day you can knock and talk. Morse was aware that officers may enter private property in exigent circumstances, which arise where there

is a risk that evidence will be destroyed, a person will be harmed, or officer safety is at risk. Morse was also aware that Maine law permits officers to arrest without a warrant "any person who the officer has probable cause to believe has committed or is committing . . . [d]omestic violence assault, domestic violence criminal threatening, domestic violence terrorizing, domestic violence stalking or domestic violence reckless conduct." Me. Rev. Stat. tit. 17-A, § 15(1)(A)(5-B). While still at 60 Park, Morse had said to Officer Fearon that they had enough to "hook" French on harassment and stalking after his second break-in.

Having decided that a further knock and talk was appropriate, Morse and Fearon went to a strip of grass on the side of 13 Park. Morse stated that he did not know where the property line was, but acknowledged that he was on the curtilage of 13 Park when knocking on the window frame. In deciding to knock at the window, he factored in that it was an apartment and that French had non-relative roommates living with him. Morse's understanding was that officers can knock several times during a knock and talk, but must stop before it becomes unreasonable.

It was not the defendant officers but Fearon who then knocked on the window frame of French's bedroom window. Only after that did Morse knock on the window twice. The total time of the two different officers knocking on the window frame was almost exactly two minutes. For French to have responded to the window

knocking, he would have had to come out from his bedroom and go to the front door.

Gray then knocked on the front door again and announced their presence.  The knocking had two immediate effects.  One was that a dog started barking.  The officers said they could not tell if the dog came from 13 Park or the very nearby neighboring home.  More importantly, within thirty seconds of Gray's knocking at the front door, another tenant who lived at 13 Park who identified himself as "Corey," came to the door.  The officers asked if French was home.  Corey was not sure and asked if Gray wanted him to look for French. Gray asked him to go look for French.  Corey asked French to come to the door and French then did so.

French came outside to speak to the officers.  He refused to acknowledge that he had Nardone's phone, but said that he would look for it anyways.  The officers did not permit French to go alone inside to look for the phone, so French asked Corey to retrieve the phone and told him where to look.  After additional questioning, Officers Morse and Gray arrested French for burglary around 5:30 AM.

## II.

"The doctrine of qualified immunity shields [police officers] from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Mullenix v. Luna,

577 U.S. 7, 11 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). To show that a rule is "clearly established," "[i]t is not enough that the rule is suggested by then-existing precedent." Dist. of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018). Instead, "existing precedent must . . . place[] the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" Wesby, 138 S. Ct. at 589 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The inquiry into whether a rule is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition," and "[s]uch specificity is especially important in the Fourth Amendment context." Mullenix, 577 U.S. at 12 (quoting Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam)).

French and the majority argue that Jardines itself clearly established that the officers' conduct on September 14, 2016, violated French's constitutional rights. I disagree for several reasons. First, the holding of Jardines is not applicable here because the facts are entirely distinct, and Jardines' reasoning relied on facts not present here. Second, as made clear by Supreme Court and circuit court decisions published after Jardines, Jardines' general discussion of the knock and talk exception was not adequately specific to clearly establish the

purported illegality of the officers' conduct here. Finally, the majority seems to posit that the officers' actions somehow forced French to come to the door. The majority relies on a self-serving statement made by French after he instituted this litigation, but certainly not made to the officers at the time of these events. This argument by the majority suffers from at least three errors in itself. First, the facts do not support this assertion. Secondly, nothing in Jardines supports it. Thirdly, the majority's looking at qualified immunity, not from the objective point of view of the officers on the scene but from the point of view of French, is clearly error. On the facts of this case, a reasonable officer would easily understand that their actions had not forced or coerced French to come to the door. There were no threats and no overbearing of French's will.

As to the first issue, Jardines concerned the use of a drug-sniffing dog in the daytime, and its holding, stated at the end of the opinion, was that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." Jardines, 569 U.S. at 11-12. That holding is not applicable here, where there was no police dog or any other instrumentality used.

The analysis in Jardines also depended on the fact that the officers entered the property to gather information on the curtilage, not to speak with a resident. E.g., id. at 6 ("[The

- 57 -

Fourth Amendment] right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity."); id. at 9 ("The scope of a license . . . is limited . . . to a specific purpose. . . . Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search." (emphasis added)); id. at 9 n.4 ("What [Kentucky v.] King establishes is that it is not a Fourth Amendment search to approach the home in order to speak with the occupant, because all are invited to do that. . . . But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search." (second emphasis added) (citing 563 U.S. 452, 469-70 (2011)); id. at 11 ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." (emphasis added)). The court stated that the case turned on "whether the officers had an implied license to enter the porch, which in turn depend[ed] upon the purpose for which they entered." Id. at 10. The officer had exceeded the scope of the implied license because his "behavior objectively reveal[ed] a purpose to conduct a search, which is not what anyone would think he had license to do." Id. at 10 (emphasis added). In contrast, as the Court explained "the officers could have lawfully approached [Jardines'] home to knock on the front

door in hopes of speaking with him.  Of course, that is not what they did." Id. at 7 n.1.

In the instant case, it is undisputed that the officers were knocking on the door to try to speak with French, not to search the property, as in Jardines.  Jardines is not about the limitations, if any, on the duration or location of a knock and talk license to contact the resident of a home, and thus could not clearly establish the purported illegality of the officers' conduct.  Cf., e.g., United States v. Walker, 799 F.3d 1361, 1363 (11th Cir. 2015) (citing Jardines for the proposition that officers exceed the implicit license of the knock and talk exception when their conduct objectively reveals a purpose to conduct a search).  Jardines also did not concern a situation in which the officers had to act quickly to ensure the safety of a victim or prevent the destruction of evidence.  See Kentucky v. King, 563 U.S. 452, 472 (2011) (holding that officers may enter a residence without a warrant in order to prevent the destruction of evidence).  Nor did Jardines discuss how the analysis might change when officers are investigating a crime for which state law authorizes a warrantless arrest.

As to the majority's argument that the purported illegality of the officers' conduct was clearly established by the broad "legal principle at the core of Jardines" because "[i]t does not take 'fine-grained legal knowledge' to understand that the

officers' actions in this case exceeded the implicit authorization to enter the property of another without a warrant," there are several problems with this reasoning. As explained above, the argument relies on language about the scope of the knock and talk exception which is not the holding of <u>Jardines</u> or central to <u>Jardines</u>' analysis. <u>See</u> Garner, et al., <u>The Law of Judicial Precedent</u> 26, 82 (2016) (defining scope of judicial holdings). It ignores the Supreme Court's instruction that the clearly established inquiry "must be undertaken in light of the specific context of the case" and not "at a high level of generality." <u>Mullenix</u>, 577 U.S. at 12 (first quoting <u>Brosseau</u>, 543 U.S. at 198; and then quoting <u>al-Kidd</u>, 563 U.S. at 742). It also ignores the language of <u>Jardines</u> itself, which clarifies that the implied license is only "typically" limited to walking up the front path of a home and knocking. <u>Jardines</u>, 569 U.S. at 8.

Subsequent decisions from the Supreme Court and from our sister circuits make clear that the purported illegality of the officers' actions -- including knocking at the window, knocking multiple times, and knocking late at night -- was not clearly established by <u>Jardines</u>' general rule.

In <u>Carrol</u> v. <u>Carman</u>, the Supreme Court held that it had not been clearly established, and it would not decide, whether officers could perform a knock and talk "at any entrance that is open to visitors rather than only the front door." 574 U.S. 13,

20 (2014). By refusing to decide the issue, the Court made clear that Jardines' description of the implied license -- despite specifying that "typical" knock and talk would be at the front door -- did not clearly establish that only a knock at the front door was acceptable. Since then, several circuits have held that officers may knock at various places on the property if they have reason to believe that they will find a resident. See, e.g., Covey v. Assessor of Ohio Cnty., 777 F.3d 186, 193 (4th Cir. 2015) ("An officer may also bypass the front door (or another entry point usually used by visitors) when circumstances reasonably indicate that the officer might find the homeowner elsewhere on the property"); United States v. Walker, 799 F.3d 1361, 1364 (11th Cir. 2015) (per curiam) (holding that knock on car window in carport away from front door was acceptable under knock and talk exception).

Against this background, a visitor, knowing that this was a multi-tenant unit and precisely where French's room was, could quite reasonably go to his window to knock rather than use the door. So could a neighbor who, having received no response at the front door, knock on a window to get the attention of an occupant.[25] There was absolutely no impediment to stop visitors

---

[25] The majority argues that this contention is "contrary to Jardines." This once again misunderstands the qualified immunity inquiry and Jardines itself. To overcome the defense of qualified immunity, it is not up to the officers to demonstrate the

from knocking at the window, which was adjacent to the neighbors' driveway.

The Eleventh Circuit case United States v. Walker shows even more clearly that the purported illegality of Officer Gray and Morse's actions was not clearly established.  In Walker, police officers went to a home and knocked at 9:00 PM and 11:00 PM to attempt to speak with a resident.  799 F.3d at 1362.  They returned shortly after 5:00 AM and saw that there were lights on in the house and in a car parked in a carport thirty feet from the house. Id.  The officers went to the car and knocked on the car window. Id.  The man inside the car stepped out, and in the course of his interaction with the police, the police found counterfeit currency in his home.  Id. at 1362-63.  The Eleventh Circuit affirmed the denial of the defendant's motion to suppress evidence discovered as a result of the third knock and talk on the car window.  Id. at 1364.  It first explained that the officers' actions did not exceed the implied license to knock and talk because their purpose was "to speak with the homeowner, which is conduct that falls squarely within the scope of the knock and talk exception" and not to search

constitutionality of their actions, but to French to show that no reasonable officer in these officers' positions could have thought that their actions were constitutional.  The fact that a visitor who knew which bedroom was French's could knock on his window in addition to the door simply goes to the reasonableness of the officers' doing so and establishes that their actions are entitled to qualified immunity.

- 62 -

the property.  Id. at 1363.  The court then reasoned that going to the carport was a permissible "small departure from the front door . . . when seeking to contact the occupants" because "the officers entered [the carport] because they had reason to believe the house's occupant was sitting in the car parked inside."  Id. at 1364 (alteration in original) (quoting United States v. Taylor, 458 F.3d 1201, 1205 (11th Cir. 2006)).  The Eleventh Circuit also rejected the argument that in all circumstances "going to someone's house before sunrise to knock on the door is unreasonable and exceeds the implied invitation that underlies the knock and talk exception."  Id. at 1364.  It explained that the officers' actions were reasonable because they had seen a light on at 5:04 AM, suggesting that someone was awake.  Id.

Given that Walker was decided before the events of this case, I cannot agree that it was clearly established "beyond debate" that Morse and Gray's actions here violated the Fourth Amendment.  al-Kidd, 563 U.S. at 741.  In Walker, the police approached the home to knock three distinct times, twice at his front door and once on his car window away from the front porch.  799 F.3d at 1364; see also United States v. White, 928 F.3d 734, 739-41 (8th Cir. 2019) (holding that officers had not violated the Fourth Amendment by approaching a home multiple times in one day in an effort to make contact with the property owner).  Officers Morse and Gray knocked four times.  Each of the knocks in Walker

was at night, and one was at 5:00 AM, essentially the same time that Morse knocked on French's window. As in Walker, Morse and Gray had reason to know that French was awake and that they might reach him by knocking somewhere other than the front door -- here a bedroom window instead of a car window on the curtilage of the home.[26]

The majority commits further errors when it relies on French's post-litigation self-serving statements that he felt he had "no choice" but to answer the door. He made no such assertion to the officers and he voluntarily answered the door. The majority attempts to imply that the officers' actions somehow coerced French

---

[26] The majority does not argue that French revoked his implied license or that the officers reasonably should have understood him to have done so. Perhaps this is because French could have at any time explicitly told the officers to leave, or had his roommate do so when his roommate answered the door, but chose not to. At any rate, the determination as to when an implied license has been revoked is yet another question about the scope of the implied license left open by Jardines. See United States v. Smith, No. 16-91-01, 2017 WL 11461045, at *11 (D.N.H. Oct. 18, 2017) ("[T]he First Circuit Court of Appeals has yet to delineate the contours of revocation."). Not only is there a dearth of case law on this topic in our circuit, but courts in other circuits have indicated that the license is difficult to revoke. See United States v. Carloss, 818 F.3d 988, 996-97 (10th Cir. 2016) (posting "No Trespassing" sign in yard and "Posted Private Property Hunting, Fishing, Trapping or Trespassing for Any Purpose Is Strictly Forbidden Violators Will Be Prosecuted" sign on door did not revoke implied license for knock and talk); cf. Edens v. Kennedy, 112 Fed. App'x 870, 875 (4th Cir. 2004) (finding police could not knock and talk where house was fenced in, gate was locked, and "No Trespassing" sign posted); see also United States v. Holmes, 143 F. Supp. 3d 1252, 1262 (M.D. Fla. 2015) (noting implied license can be revoked by "express orders from the person in possession" (citation omitted)).

into answering the door. The majority cannot squarely make this argument because Jardines says nothing about coercion -- unsurprisingly, since it is a case fundamentally about searches conducted in the curtilage of people's homes and not about the scope of the knock and talk warrant exception. Nevertheless, the majority finds that the officers "reenter[ing] the property four times and [taking] aggressive actions until French came to the door" was somehow contrary to law clearly established in Jardines. Jardines simply does not address how many attempts officers who want to knock and talk may make to get the attention of one occupant of a multi-occupant house. In finding that the law was clearly established, the majority holds without any correct citation that every reasonable officer would have known reentry onto the property and "aggressive actions" are foreclosed by Jardines. This finding is mistaken in several respects.

First, it is simply not clearly established law that repeated entries onto different locations on a property to get the attention of the person sought are unconstitutionally coercive. As stated above, in both Walker and White, courts in other circuits found no constitutional problem with repeated entries onto a defendant's property.[27] Walker, 799 F.3d at 1363-64; White, 928

_____

[27] As for "aggressive actions," the majority provides no guidance for how this highly subjective term might be defined, much less any actual cases outlining its scope.

F.3d at 739-41. A reasonable officer could conclude that the efforts to find French permissibly included going to his window as well as the front door to knock, and that this was efficient and hardly "aggressive." The majority rests its entire case on Jardines, which does not answer these questions.

In cases from our circuit that actually discuss coercion, we make clear that the law sets a high bar. For example, in order for a confession to be said to be coerced, the person being questioned must have their will "overborne." United States v. Jackson, 608 F.3d 100, 103 (1st Cir. 2010) (citing Arizona v. Fulminante, 499 U.S. 279, 288 (1991)) ; see also United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002) (noting that police must not "apply undue or unusual pressure . . ., use coercive tactics, or threaten [the defendant] with violence or retaliation if he did not confess."). Contrary to French's litigation statements made in furtherance of his efforts to obtain a damages award from these officers, there is no support for the contention that the officers' conduct overbore his will and forced him to come to the door.[28] He did not ask the officers to leave, nor did he ask his roommate to tell them to go away when his roommate answered the door.

_____

[28] In fact, in his deposition, French stated "I knew I had the right to not come outside if I didn't want to." As the majority acknowledges, French had experience with the criminal justice system before this event, having been arrested previously in February 2016. In the same deposition, French stated he had already been arrested "four times."

- 66 -

Despite the majority's attempts to buttress its argument by focusing on French's belated statement of his subjective feelings before he came to the door, the proper focus of the qualified immunity inquiry is whether the officers would have known their actions were unconstitutional. The answer, contrary to the majority, is that a reasonable officer could have thought these actions were constitutional. In qualified immunity determinations, "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established." Mullenix, 577 U.S. at 12 (emphasis in original) (citing al-Kidd, 563 U.S. at 742).

The majority's entire approach to qualified immunity runs counter to both the Supreme Court's and this circuit's precedents. The "clearly established" inquiry is not supposed to entail elucidating an abstract principle from a single case and asking how a reasonable officer would have applied that principle in a given situation. Rather, it requires asking whether the constitutionality of the official's behavior was placed "beyond debate" by existing precedent. al-Kidd, 563 U.S. at 7471. The inquiry requires "specificity," particularly in Fourth Amendment cases. Mullenix, 577 U.S. at 12. The majority makes clear that it is not concerned with what it views as trivial details like "the number of officers present or the hour, location, or length of the attempted knock and talks." It should be. In ignoring the

specifics of the case and the very real questions left open by Jardines to reach its decision, the majority defines clearly established law at the "high level of generality" the Supreme Court has expressly foreclosed. al-Kidd, 563 U.S. at 742.

The need for swift action also distinguishes this case from Jardines and undercuts the majority's argument that general principles of Jardines clearly established the purported illegality of the officers' conduct. There are two basic reasons for this among many others. First, the Supreme Court has recognized that officers may enter a residence without a warrant in order to prevent the destruction of evidence. King, 563 U.S. at 472. Here, a reasonable officer could have thought that their conduct did not violate any constitutional rights because a knock and talk could prevent French from destroying or disposing of Nardone's phone, keys, and any other evidence of the break-in. Second, there was an imminent threat to Nardone, and the officers certainly were allowed to attempt to talk to French in an effort to secure her safety. Cf. id. at 460 (recognizing that officers may enter a home without a warrant to prevent "imminent injury").

As we have recognized, "the Supreme Court's standard of reasonableness is comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present." Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994). We have also

- 68 -

recognized that deference to officers' decisions in these circumstances is particularly warranted in domestic violence situations where "violence may be lurking and explode with little warning." Fletcher v. Town of Clinton, 196 F.3d 41, 50 (1st Cir. 1999). The officers here knew of the potential danger to Nardone, and the potential for destruction of evidence, and they also knew that getting a warrant would be a lengthy process. With these factors in mind, the officers made the considered determination that it was reasonable to attempt several knock and talks.

This circuit's recent decision in United States v. Manubolu, No. 20-1871, 2021 WL 4167087 (1st Cir. Sept. 14, 2021), underscores how long wait times for warrants factor into the reasonableness determination. In the aftermath of a car crash, the court found that police did not violate the defendant's constitutional rights by conducting a blood draw to check his blood alcohol levels without a warrant where the procedure for getting a warrant was "protracted," the blood alcohol evidence in his bloodstream was dissipating, and the defendant needed medical attention. Id. at *9-10, *13. Under the totality of the circumstances, the court found that it was reasonable for the officer to think exigent circumstances existed to permit a warrantless blood draw. Id. at *13. There, the officer knew of a National Park Service regulation which prohibited warrantless blood draws absent exigent circumstances. Id. at *3. Here, in

contrast, there was no analogous statute since no warrant was required for a knock and talk. Given the length of time it would have taken to get a warrant, the possibility that evidence would be destroyed, and the potential for harm to Nardone, the officers here made an objectively reasonable decision under the circumstances to continue to attempt to knock and talk. The officers' actions were lawful, but, even if they were not, the totality of the circumstances informing their decisions is yet another reason why adherence to the law requires that the grant of qualified immunity be affirmed.

### III.

The majority's decision, in my view, disincentivizes police from acting on and taking seriously the complaints of persons of any gender who credibly seek law enforcement help when they have been threatened by former romantic partners. I cannot agree that Jardines was sufficiently analogous to place the legality of these officers' actions "beyond debate." In my view, under controlling Supreme Court precedent, the only correct result here is the affirmance of the grant of qualified immunity to these officers. The officers here acted reasonably in making repeated efforts to reach French where he was acting erratically and Nardone explained that the danger to her would increase as French was given more time to break into and read the contents of her phone. The officers knew French was awake despite the time, and it was a

rational choice in a multi-tenant apartment for the officers to knock on French's bedroom window to try to speak to him. Nothing in Jardines or any other case clearly established that these actions violated the Fourth Amendment.

I dissent.