# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 95
The People &c.,
   Respondent,
  v.
Devon T. Butler,
   Appellant.

Clea Weiss, for appellant.
Benjamin E. Holwitt, for respondent.
New York State Association of Criminal Defense Lawyers, amicus curiae.

CANNATARO, J.:

Over the past forty years, the United States Supreme Court has taken an incremental approach to determining whether the police technique of using a canine's heightened sense of smell to detect the presence of illegal drugs offends the prohibition on unreasonable searches set forth in the Fourth Amendment to the United States Constitution. Today we

- 1 -

take the logical next step in that progression: we hold that the use of a narcotics-detection dog to sniff defendant's body for evidence of a crime qualified as a search and thus implicated the protections of the Fourth Amendment.

The suppression court terminated its review of the canine sniff of defendant's person upon concluding that it did not qualify as a search. Although the Appellate Division correctly resolved that question on appeal, it erred in holding that a canine body sniff requires reasonable suspicion and was justified here, issues that were not decided adversely to defendant by the suppression court. We accordingly reverse and remit this case to County Court for consideration of the remaining questions in the first instance.

I.

In 2017, two police officers observed what they believed to be a hand-to-hand drug transaction in a parking lot known for such activity. The officers followed defendant's vehicle from the scene. After observing defendant engage in evasive driving maneuvers and failing to stop at a stop sign, the officers initiated a traffic stop. Upon questioning, defendant admitted that he did not have a valid driver's license, and his explanation of his destination and origin did not align with what the officers had observed. When defendant stepped out of his vehicle, the officers noticed a bulge in his pants that he explained was $1,000 cash.

After defendant declined the officers' request for consent to search his vehicle, one of the officers retrieved a Belgian Malinois named Apache to sniff-test the vehicle for the presence of narcotics. As the canine was led toward the vehicle it began to pull on its leash toward defendant, who was then standing six to eight feet away, indicating to the officer

that the dog was "in odor" and had caught the scent of narcotics. After being redirected to the vehicle, the canine jumped into the driver's seat and again indicated that it was in odor. The officer then decided to "see if there's any odor on [defendant]." He "extended the leash a little bit" so the canine could walk around defendant, at which point the dog indicated for the third time that it was in odor, put its nose in defendant's "groin/buttock region," and sat, alerting the officer that it had located narcotics. When the officer stated that "[t]he dog has got something," defendant ran.

The officers and Apache pursued and ultimately apprehended defendant.[1] Because they had seen defendant reach into his pants as he fled, the officers conducted a search of the surrounding area and recovered a plastic bag containing 76 glassine envelopes of heroin, which defendant admitted belonged to him. Defendant was charged with criminal possession of a controlled substance in the third degree, tampering with physical evidence, and obstructing governmental administration in the second degree.

Defendant moved to suppress evidence of the drugs, arguing that the officers' use of a canine to search his vehicle and person was unlawful. Following a hearing, County Court denied the motion, reasoning that the officers had a "founded suspicion" of criminal activity to justify the sniff-search of defendant's vehicle, but that the sniff of defendant's person was not a search because there is no "reasonable expectation of privacy in the air surrounding a person" and it was "perfectly acceptable for Apache to approach defendant in an effort to 'sniff' the air surrounding defendant." The court also determined that

---

[1] Apache remained leashed throughout the encounter.

defendant had voluntarily abandoned the narcotics during his flight from police. Following these rulings, defendant pleaded guilty to both the possession and tampering charges and appealed from the resulting judgment.

The Appellate Division affirmed on different grounds in a divided opinion. The majority agreed with County Court that the canine search of defendant's vehicle was lawful, but stated that the suppression court had "inaccurately characterized" what occurred thereafter as "a canine simply sniffing the air around defendant" rather than as a "contact sniff" of defendant's person (196 AD3d 28, 31 [3d Dept 2021]). The Court determined that the contact sniff intruded upon defendant's personal privacy and therefore qualified as a search under both Federal and State constitutional law. The Court further held that this type of search requires reasonable suspicion of criminal activity because "[a] canine sniff is a minimal intrusion compared to a full-blown search of a person" (id.). Insofar as the canine had twice signaled that it had detected the scent of narcotics "[w]ithout prompting" by the officers, the Court concluded that there was a reasonable and articulable basis to suspect that defendant possessed narcotics on his person, and that the resulting contact sniff was not unreasonable under the circumstances (id. at 31-32). The Court stated that defendant's remaining contentions were unavailing because "[h]aving discarded the heroin while properly being pursued by the officers, defendant abandoned any right to challenge the seizure of this evidence" (id. at 32).

One Justice concurred with the result, agreeing with the majority that the canine sniff of defendant's person qualified as a search but opining that the Court lacked jurisdiction under CPL 470.15 (1) and *People v LaFontaine* (92 NY2d 470 [1998]) to

decide whether the search was justified or the legal standard governing that question, issues that had not been decided adversely to defendant by County Court (196 AD3d at 32-33 [Aarons, J., concurring]). The concurrence would instead have affirmed based on County Court's abandonment analysis (*id.* at 33).

Another Justice dissented, agreeing with the majority and concurrence that the canine sniff of defendant's person was a search but opining that such a search requires probable cause and that no such cause existed here (*id.* at 33 [Pritzker, J., dissenting]). The dissenting Justice granted leave to appeal to this Court.

II.

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" (US Const, 4th amend). The purpose of this prohibition is to safeguard the privacy and security rights of individuals against arbitrary invasions by the government (*Carpenter v United States*, 585 US___ , ___, 138 S Ct 2206, 2213 [2018]). Thus, when an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, official intrusion into that private sphere generally qualifies as a search (*id.*).

The Supreme Court has yet to decide whether the use of a canine to detect the scent of illegal drugs concealed on a person's body qualifies as a search within the meaning of the Fourth Amendment, and the question appears to be one of first impression in New York. That said, the Supreme Court has considered and resolved a number of challenges to the use of drug-sniffing dogs by law enforcement in other contexts and reached different

conclusions depending on the interests and circumstances involved.  We accordingly turn first to that precedent for guidance in answering the question.

A.

*United States v Place*

The Supreme Court's jurisprudence on the use of drug-sniffing dogs by law enforcement begins with *United States v Place* (462 US 696 [1983]).  In that case, the Court held that having a canine sniff the outside of an airplane passenger's suitcase for the presence of illegal drugs inside did not constitute a search under the Fourth Amendment. The Court opened its analysis by acknowledging that "a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment" (*id.* at 707, quoting *United States v. Chadwick*, 433 US 1, 7 [1977]).  The Court opined, however, that a canine sniff of a suitcase "is much less intrusive than a typical search" insofar as it "does not require opening the luggage" and "discloses only the presence or absence of narcotics, a contraband item" (*id.*).  In the Court's view, the limited nature of that disclosure "ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods" (*id.*).  For these reasons, the Court described a canine sniff as "*sui generis*" and concluded that "the particular course of investigation that the agents intended to pursue—exposure of

respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment" (*id.*).[2]

### Illinois v Caballes

Next in our review of federal canine-sniff jurisprudence is *Illinois v Caballes* (543 US 405 [2005]). In that case, the Court held that the use of a "well-trained narcotics-detection dog" to sniff the exterior of a vehicle during a lawful traffic stop "generally does not implicate legitimate privacy interests" or qualify as a search (*id.* at 409). The Court reasoned that government action constitutes a search only if it compromises a "legitimate" interest in privacy, and that "governmental conduct that *only* reveals the possession of contraband" does not qualify "because the expectation that certain facts will not come to the attention of the authorities is not the same as an interest in privacy that society is prepared to consider reasonable" (*id.* at 408-409 [internal quotation marks omitted]). The Court noted that in *Place*, it had "treated a canine sniff by a well-trained narcotics-detection dog as '*sui generis*' because it 'discloses only the presence or absence of narcotics, a contraband item' " (*id.* at 409, quoting 462 US at 707). Given that the canine sniff in *Caballes* "was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Court concluded that "[a]ny intrusion on [the defendant's] privacy expectations d[id] not rise to the level of a constitutionally cognizable infringement" (*id.*).

---

[2] Notably, the canine sniff in *Place* occurred after officers had lawfully seized the defendant's suitcase from an airport based on reasonable suspicion of drug-trafficking activity (462 US at 699, 704-705).

*Florida v Jardines*

The most recent Supreme Court decision in this arena is *Florida v Jardines* (569 US 1 [2013]). There, the Court held that having a canine sniff a homeowner's porch to discern whether narcotics are present inside the residence is a search within the meaning of the Fourth Amendment. The Court explained that "the area immediately surrounding and associated with the home—what our cases call the curtilage—is part of the home itself for Fourth Amendment purposes" (*id.* at 6 [internal quotation marks omitted]). Further, in conducting the search, the government had exceeded the scope of any invitation or license implicitly granted by the homeowner to the public regarding the use of a porch. In this regard, the Court recognized that there is a well-understood license, "implied from the habits of the country," that permits visitors "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave" (*id.* at 8 [internal quotation marks omitted]). The Court reasoned that such license permits "a police officer not armed with a warrant [to] approach a home and knock, precisely because that is 'no more than any private citizen may do' " (*id.*, quoting *Kentucky v King*, 563 US 452, 469 [2011]).

> "But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is

limited not only to a particular area but also to a specific purpose" (*id.* at 9).

The Court acknowledged holding in *Place* and *Caballes* that canine sniffs of closed suitcases and lawfully-stopped automobiles generally do not violate legitimate privacy interests, but distinguished those decisions on the ground that the officers in *Jardines* had learned what they learned only by "physically intruding" upon an area "protect[ed] as part of the home itself" (*id.* at 6, 11). The Court explained that since its conclusions were based on "the traditional property-based understanding of the Fourth Amendment," it "need not decide whether the officers' investigation of [the defendant's] home violated his expectation of privacy" (*id.* at 11).

Justice Kagan wrote separately to note that she "could just as happily have decided [the appeal] by looking to [the defendant's] privacy interests" (*id.* at 13 [Kagan, J., concurring]). As she would have articulated the rule: "privacy expectations are most heightened in the home and the surrounding area," and "police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there" (*id.* at 13 [internal quotation marks omitted]).

## B.

Applying the Supreme Court's Fourth Amendment jurisprudence to the instant case, we hold that the use of a canine to sniff defendant's body for the presence of narcotics qualified as a search. This is true even if we accept County Court's apparent conclusion that when Apache put its nose in defendant's "groin/buttock region," the dog did not make

actual contact with defendant and sniffed only the air closely surrounding his person. The lack of direct physical contact is not dispositive in this context because of the "heightened" interest society recognizes in the privacy and security of the human body, which can encompass space immediately surrounding the body and was clearly implicated by what occurred here (*cf. Jardines*, 569 US at 7 [majority op] and 13 [Kagan, J., concurring]).

It cannot be disputed that society treats many matters related to the body as private, or that individuals have a significant interest in the security and integrity of their persons (*see e.g. Missouri v McNeely*, 569 US 141, 159 [2013]; *Skinner v Ry. Labor Executies' Assn.*, 489 US 602, 616 [1989]; *Terry v Ohio*, 392 US 1, 9 [1968]; *Schmerber v California*, 384 US 757, 772 [1966]). The Fourth Amendment protects those important interests from unreasonable intrusion by the government. Indeed, although this Court has at times described governmental intrusion into the home as "the chief evil" against which the Fourth Amendment is directed (*see People v Levan*, 62 NY2d 139, 144 [1984] [internal quotation marks omitted]), the text of the Constitution notably lists "[t]he right of the people to be secure in their persons" first among the several areas entitled to protection, and the Supreme Court has recognized the heightened nature of that interest (US Const, 4th amend; *see Terry*, 392 US at 9 [" '*No right* is held more sacred, or is more carefully guarded, . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others' " (emphasis added, quoting *Union P. R. Co. v Botsford*, 141 US 250, 251 [1891])]; *see also Horton v Goose Cr. Ind. Sch. Dist.*, 690 F2d

470, 478 [5th Cir 1982] ["the (F)ourth (A)mendment applies with its fullest vigor against any intrusion on the human body"]).

Thus, the Supreme Court has long held that the Fourth Amendment is implicated when the government attempts to gather evidence of criminal activity from an individual's person. It has recognized that a search occurs whether the particular method employed by the government entails a "compelled surgical intrusion into an individual's body" (*Winston v Lee*, 470 US 753, 759 [1985]; *see Schmerber*, 384 US at 767); "gentle" or "light" contact with the body (*see Maryland v King*, 569 US 435, 446 [2013]); "brief" contact with "outer clothing" (*Terry v Ohio*, 392 US 1, 24-25 [1968]); mandated collection *by the individual searched* of matter emitted from their body for testing by the government (*Skinner*, 489 US at 617); or the "visual and aural monitoring" of private bodily functions (*id.*). In addition, multiple federal circuit courts have held that the use of magnetometers to detect concealed metal is a search, notwithstanding that the use of such technology does not involve physical contact and is "far less intrusive than the use of large dogs to sniff [people's] bodies" (*Horton*, 690 F2d at 478 [collecting authorities]; *see United States v Albarado*, 495 F2d 799, 803 [2d Cir 1974] ["Even the unintrusive magnetometer walk-through is a search in that it searches for and discloses metal items within areas most intimate to the person where there is a normal expectation of privacy"]).

This precedent confirms that the presence or absence of direct physical contact with the body is not determinative of whether or not government conduct implicates "[t]he right of the people to be secure in their persons" and qualifies as a search; the question turns instead on whether the conduct compromises personal dignity and violates reasonable

social expectations concerning the security of one's body and the privacy of matters related thereto (*see* US Const, 4th Amend; *Skinner*, 489 US at 613-614 [the Fourth Amendment "guarantees the privacy, dignity, and security of persons"]; *King*, 569 US at 446 ["The fact that an intrusion is negligible [or severe] is of central relevance to determining reasonableness, [but] *it is still a search as the law defines that term*" (emphasis added)]).

Compared to a sniff of an inanimate object like a closed suitcase or automobile, the sniffing of the human body involves an obviously greater intrusion on personal privacy, security, and dignity. Most people "deliberately attempt not to expose the odors emanating from their bodies to public smell" and experience anxiety and embarrassment at the thought of emitting odors, demonstrating the sensitivity of the matter (*see Horton*, 690 F2d at 478). Moreover, it is of little consolation in this context that the only information a canine may be capable of conveying to police is the presence of illegal drugs. The "embarrassment and inconvenience" of this type of search does not arise solely from fear that the canine will reveal the presence of contraband (*compare Place*, 462 US at 707), but from the objectively undignified and disconcerting experience of having an unfamiliar animal place its snout and jaws in close proximity to—if not direct contact with—vulnerable parts of our bodies (*see Horton*, 690 F2d at 478 [collecting academic commentary that "the intensive smelling of people, even if done by dogs, is indecent and demeaning" (brackets and internal quotation marks omitted)]; *compare Terry*, 392 US at 24-25, 29-30 [even a "limited search of the outer clothing," in which an officer "do(es) not place his hand in (an individual's) pockets or under the outer surface of their garments," "constitutes a *severe*,

though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience" (emphasis added)]).

In this regard, it also cannot be ignored that some people are afraid of dogs, particularly police canines, which are usually quite large and can be cross-trained to apprehend fleeing suspects (*see* Ann L. Shiavone, *K-9 Catch-22: The Impossible Dilemma of Using Police Dogs on Apprehension*, 80 U Pitt L Rev 613, 622, 652 & nn 287-288 [Spring 2019]; Police Executive Research Forum, *Guidance on Policy and Practices for Patrol Canines*, 14 [2020], *available at* https://www.policeforum.org/assets/Canines.pdf). Although deaths caused by canines are rare, fear and distrust of their use by law enforcement is not without justification, particularly considering the shameful history in this country of police using canines to intimidate and control people of color and marginalized communities (*see e.g.*, Shontel Stewart, *Man's Best Friend? How Dogs Have Been Used to Oppress African Americans*, 25 Mich J Race & L 183 [May 2020]).

In permitting Apache to approach and sniff defendant for evidence of criminal activity, the officers also exceeded the scope of any invitation or license implicitly granted by defendant with respect to his so-called personal space (*cf. Jardines*, 569 US at 8-9). Preliminarily, although the Supreme Court in *Jardines* borrowed from implied-license principles as part of its property-law analysis upon concluding that a porch is part of the home for Fourth Amendment purposes, consideration of the implied social licenses that govern human interaction is also helpful to assess whether a canine sniff of a person violates an expectation of privacy considered reasonable by society (*see id.* at 13-14 [Kagan, J., concurring] ["The law of property naturally enough influences our shared

societal expectations of what places should be free from governmental incursions" (internal quotation marks and brackets omitted)]; *French v Merrill*, 15 F4th 116, 131 [1st Cir 2021] [*Jardines* "clearly established that an implicit social license sets the boundaries of what acts officers may engage in"], *rehg en banc denied* 24 F4th 93 [1st Cir 2022], *cert denied* 143 S Ct 301 [2022]).  For our part, we will assume that when a person decides to venture out into the public square, they implicitly permit others—including not just friends and coworkers but certain strangers and even police—to approach and interact in ways that may put them in a position to notice odors emanating from the body (say, in a crowded queue or rush-hour subway car).  However, it is not part of the social convention for strangers to enter each other's personal space for the specific purpose of sniffing each other; such conduct is likely to be considered alarming and intrusive.  Even with pets, it is generally considered rude to allow one's dog to approach and intensively sniff a stranger without consent.  And introducing a trained police dog to explore otherwise *undetectable* odors in the hopes of discovering incriminating evidence is "something else" entirely; it goes far beyond any implied social license or reasonable expectation (*Jardines*, 569 US at 9).  Authorization to engage in canine forensic investigation assuredly does not inhere in the very act of venturing out in public (*see Carpenter*, 138 S Ct at 2217 ["A person does not surrender all Fourth Amendment protection by venturing into the public sphere.  To the contrary, what one seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected" (internal quotation marks and brackets omitted)]).

Finally, a refusal by this Court to recognize what occurred here as a search would sanction law enforcement to roam the streets of this State's cities and neighborhoods with

police dogs arbitrarily sniffing people for evidence of crimes, a picture straight out of dystopian fiction. Recognizing this form of investigative technique as a search is therefore consistent with "a central aim of the Framers[, which] was 'to place obstacles in the way of a too permeating police surveillance'" (*Carpenter*, 138 S Ct at 2214, quoting *United States v Di Re*, 332 US 581, 595 [1948]).

For all of these reasons, we conclude that the canine sniff of defendant's person qualified as a search under the Fourth Amendment.

III.

The second question presented by this appeal is whether the Appellate Division could decide that a canine sniff search of a person requires reasonable suspicion and was justified in this case. We conclude that the Appellate Division lacked jurisdiction to resolve those issues because County Court did not decide them adversely to defendant (*see LaFontaine*, 92 NY2d at 473-474).

Section 470.15 (1) of the Criminal Procedure Law functions as "a legislative restriction on the Appellate Division's power to review issues either decided in an appellant's favor, or not ruled upon, by the trial court" (*People v Harris*, 35 NY3d 1010, 1011 [2020] [internal quotation marks omitted]). Here, the statute barred the Appellate Division from affirming defendant's judgment based on a ground not decided adversely to him by the suppression court (*see id.*). County Court held that the canine sniff of defendant's person did not qualify as a search. The court did not decide the standard that would govern if the canine sniff *did* so qualify, much less whether that standard was met. Those questions present "separate" and "analytically distinct" issues from the threshold

question of whether the sniff implicated constitutional protections or prohibitions (*compare People v Garrett*, 23 NY3d 878, 885 n 2 [2014]). The Appellate Division therefore erred in deciding those questions adversely to defendant.

Finally, it is unclear whether County Court's conclusion that defendant "abandoned" the narcotics during his flight from police was premised on its holding that the canine sniff of defendant was not a search and was "perfectly acceptable." Because abandonment analysis turns largely on whether the law enforcement conduct preceding the purported abandonment was lawful or unlawful (*see People v Ramirez-Portoreal*, 88 NY2d 99, 110 [1996]; *People v Boodle*, 47 NY2d 398, 402 [1979]), consideration of this issue potentially raises another *LaFontaine* issue and must also be referred back to County Court.

Accordingly, the order of the Appellate Division should be reversed, and the case remitted to County Court for further proceedings in accordance with this opinion.

Order reversed, and case remitted to County Court, Broome County, for further proceedings in accordance with the opinion herein. Opinion by Judge Cannataro. Chief Judge Wilson and Judges Rivera, Garcia, Singas, Troutman and Halligan concur.

Decided December 19, 2023